**FILED- LN**

July 24, 2024 12:03 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: eod  scanned by: 7/24

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

**DARIA J. FORBES**

       **Plaintiff,**

**CASE NO.:**   1:24-cv-750

v.                                Paul L. Maloney

**MERIDIAN CHARTER TOWNSHIP**    U.S. District Judge

       **Defendant**

| | |
|---|---|
| Daria J. Forbes<br>Plaintiff<br>IN PROPRIA PERSONA<br>1429 Weatherhill Court<br>East Lansing, MI 48823<br>(517) 883-1413<br>djforbes@epiranhabiz.com | Meridian Charter Township<br>Defendant<br>5151 Marsh Road<br>Okemos, MI 48864 |

## COMPLAINT

NOW COMES Daria J. Forbes, IN PROPRIA PERSONA, and for her Complaint against Meridian Charter Township states as follows:

### INTRODUCTION

1.    This is an action to remedy violations of the rights of DARIA FORBES ("FORBES") under Title VII of the Civil Rights Act of 1964 (42 U.S. C. § 2000e et. seq.) ("Title VII"), and the Michigan Elliot Larson Civil Rights Act of 1976 ("Elliot Larson Act"), as well as an action alleging the common law torts of Negligence and Gross Negligent Infliction of Emotional Harm.

2.    FORBES was subjected to both quid pro quo and hostile work environment sexual harassment as a result of the actions of Meridian Charter Township's ("TOWNSHIP") at the time of the subject violations alleged in this Complaint Clerk Brett Dreyfus ("DREYFUS"), and

1

Human Resource Manager Joyce Marx ("MARX"), who knew or should have known about the harassing actions by DREYFUS as against FORBES and participated in retaliation. It is further alleged that under the supervision of the TOWNSHIP, the conduct of DREYFUS and MARX in this action constitute the common law torts of Assault, Battery, and Extreme and Outrageous Conduct Causing Emotional Distress.

3.      That as a result of reporting the actions of DREYFUS, FORBES received unfavorable employment treatment by the TOWNSHIP in violation of Title VII.

4.      That the TOWNSHIP through the actions of DREYFUS and MARX breached its duty to prevent the rights of FORBES to be violated under 42 USC 1983, and as a result of this breach, FORBES was subjected to intentional torts and statutory violations of her civil rights.

5.      That the acts of the TOWNSHIP towards FORBES were so far beyond acceptable behavior, that they amounted to the tort of outrageous conduct causing emotional distress.

**THE PARTIES**

6.      That Plaintiff Daria Forbes, a female citizen of the United States residing at 1429 Weatherhill Court, East Lansing, MI 48823, was employed by Meridian Charter Township from October 14, 2019 through March 23, 2020.

7.      That upon information and belief and at all times herein mentioned, Defendant Meridian Charter Township was and is a municipality located at 5151 Marsh Road, Okemos Michigan 48864.

**JURISDICTION AND VENUE**

8.      That this action arises under 42 U.S.C. § 2000e et. seq. and 42 U.S.C. § 1983.

9.      That this Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Pursuant to

28 U.S.C. § 1391 venue is properly established in the Southern Division in the Western District of Michigan.

**FACTS**

10.    That from 10/14/2019, and until 03/23/2020, FORBES held the position of Administrative Assistant II at the Clerk's Office.

11.    That on 03/23/2020, FORBES was wrongfully discharged after being subjected, for quite a long time, to the most inappropriate, unprofessional, and discourteous manner possible, mainly on the part of DREYFUS, but fully supported by MARX and the TOWNSHIP, behavior prohibited by the Township under Chapter V. **WORKPLACE EXPECTATIONS**, Section A. **Code of Conduct/Workplace Etiquette and Work Rules**, page 19 of the **Meridian Charter Township, Personnel Policy Manual**, dated 11/24/2015.

12.    That before FORBES was offered employment in the Clerk's Office, FORBES went through three nerve-wrecking and lengthy interviews. Nerve-wrecking because they were permeated with hostile remarks coming from MARX, remarks which FORBES had never encountered before as being part of a professional interview. However, since the TOWNSHIP was not a private enterprise owned by MARX, and FORBES was not going to work in her department, FORBES decided to tough it out and respond in a professional manner based on her wide experience of employment in law offices, state government, as well as business environment.

13.    That FORBES had her first interview for the position of Administrative Assistant II Clerk's Office on 09/19/2019 at 2:30 PM with DREYFUS AND MARX, during which DREYFUS made the promise that the person occupying the position of Administrative Assistant II was intended to become the next Deputy Clerk as soon as Bob Cwiertniewicz, the then Deputy

3

Clerk, would leave his position. This promise never materialized, and Bette Bigsby ("BIGSBY") became the new Deputy Clerk.

14.     FORBES had her second interview for the above-mentioned position on 09/26/2019 at 3:30 PM with DREYFUS and MARX for the first hour. This is when MARX told FORBES that this would be her first full-time job, and that FORBES probably would not stay long as an employee at the TOWNSHIP. She said this, in spite of FORBES's wide experience in law offices, government, and business jobs, while also going to law school for FORBES's law degree. After that, MARX left the interview, and the interview continued with DREYFUS, in his office, for another hour and a half until 6 PM.

15.     At FORBES's third interview with MARX and Township Manager Walsh ("WALSH"), MARX remarked, "I know I am not supposed to ask, but where are you from originally?"

16.     That on 10/08/2019, FORBES received an offer of employment.

17.     That on 10/14/2019, FORBES came to MARX's office to sign the hiring paperwork, at which time, MARX told FORBES that FORBES probably misstated that FORBES was a graduate of the University of Michigan Ann Arbor, as well as a graduate of Western Michigan University Thomas M. Cooley Law School. However, MARX declined FORBES's offer to show her FORBES's transcripts from the above-mentioned education institutions listed in her application.

18.     That on 10/25/2019, FORBES received her first paycheck from the TOWNSHIP, and to FORBES's surprise, the paycheck listed FORBES's hiring date as of 10/04/2019, date at which FORBES was not employed by the TOWNSHIP yet.

4

19.     That on 02/10/2020, FORBES called in sick due to not feeling well. On 02/11/20, FORBES also called in sick.

20.     That on 02/12/2020, while still very ill, FORBES came to work to finish TOWNSHIP board meeting minutes. FORBES skipped her two 15-minute breaks, and one hour lunch, and left work at 3:30 PM.

21.     That on 02/13/2020, FORBES called in sick and went to Sparrow East Lansing Urgent Care. FORBES's was diagnosed with Influenza B and a sinus infection, and since FORBES had a communicable illness, FORBES was advised to remain home.

22.     That on 02/14/2020, FORBES called in sick.

23.     That on 02/17/2020 (Independence Day, the TOWNSHIP closed), FORBES went to Sparrow East Lansing Urgent Care again because FORBES didn't feel well. Since FORBES was still contagious, the doctors continued to urge her to stay home at least until 02/20/2020.

24.     That on 02/21/2020, FORBES came back to work. The same day, MARX emailed DREYFUS her recommendation to extend FORBES's probation until 03/20/2020 because of FORBES's illness absence. According to payroll, hiring date of 10/04/2019, FORBES's probation ended on 02/04/2020. However, MARX wanted just to show that FORBES was a problem employee.

25.     That on 02/26/2020, FORBES had her annual Performance Evaluation, which was mostly "Very Good."

26.     That on 02/27/2020, between 11 AM and 1:15 PM, FORBES was suddenly compelled to be in a meeting with DREYFUS and MARX. The meeting appeared to be retaliation for FORBES's letter offered to DREYFUS prior to her Performance Evaluation, in which FORBES disagreed with MARX's recommendation to extend her probation, without any

prior notice to FORBES. FORBES also reiterated once again her request to get together with DREYFUS at the end of her minutes writing for a short conference to verify the correctness of the minutes. During that meeting, FORBES was subjected to harassment consisting of intimidation, threats to quit or be fired, and insults about FORBES's work, mainly concerning FORBES's minutes from 02/18/2020. Actually, the revisions he made to FORBES's minutes were later on strongly criticized by the Township Board at the 03/03/2020 meeting. At the same meeting, MARX extended her probation from 03/20/2020 to 04/10/2020. However, the paperwork extending FORBES's probation, as well as the discussion of the meeting, promised by her, as of the date of this letter was never given to FORBES.

27.     That both MARX and DREYFUS took turns, or screaming in the same time offensive statements at FORBES, such as: "Nobody writes as poorly as you do," "Nobody gives herself an outstanding performance during self-evaluation because you cannot be perfect," "You crossed a personal line and I can no longer trust you," "You don't have any pride in your work," "If your next minutes are not how I like them to be, you are terminated," "When I do my minutes, I play the tape over and over again and I keep on editing them until I am satisfied." When FORBES responded that FORBES also played the tape a few times because the podcast did not always record statements very clearly, MARX said, "Is that because you do not understand the language due to your ethnic background, or because you have a mental disability?" DREYFUS acted in a completely unexpected way, and as if the evaluation he gave to FORBES's performance had never happened. FORBES came with great expectations to learn new things about local government and elections, however, MARX's and DREYFUS's remarks and attitude during this meeting really shook FORBES's confidence in a fulfilling career at the TOWNSHIP, and left FORBES feeling very vulnerable and emotionally distressed.

6

28.     That FORBES suggested to have a 15-minute meetings with DREYFUS upon each completion of FORBES's writing of the minutes, in order to discuss the final product with him, but DREYFUS refused. However, anytime DREYFUS wanted the minutes to promote his personal agenda, which happened very often, DREYFUS would take FORBES's writing of the minutes to his office, and would work on them alone, behind closed doors, most of the time after hours. Contrary to that, FORBES worked on the minutes during the office hours, amid loud talk, being asked to help out with different tasks, answering phone calls, meter and sort the mail, post legal notices, solve technical and office supply issues, prepare documents for new township appointees, help the new Deputy Clerk BIGSBY with her duties, and help with election assignments, among many other things.

29.     That on 02/28/2020 at 10:01 AM DREYFUS left a voicemail on the TOWNSHIP's phone on FORBES's desk to call him back to talk about the work schedule of the day. Instead, when FORBES called him back, he continued his harassment from the day before meeting by stating that if FORBES conducted herself as an attorney, or told anyone about the subject of FORBES's conversations with him, he would not only terminate FORBES employment at the TOWNSHIP, but he would ruin FORBES's future employment anywhere. DREYFUS stated that MARX also wanted to terminate FORBES. DREYFUS further stated that one mistake, or not doing what he wanted FORBES to do, would get FORBES fired. Duration of his screaming at FORBES was 16:05 minutes.

30.     That on 02/28/2020, between 5:00 PM and 7:15 PM, DREYFUS had FORBES stay to work on a letter to Ingham County Clerk Barb Byrum, a letter that he stated he should have done himself that morning. He also wanted FORBES to be in the office with him alone, so he told everyone to go home. Considering that right after FORBES's hiring, DREYFUS started

7

staring at FORBES in an offensive way and making her uncomfortable, FORBES asked BIGSBY to stay behind with FORBES to finish DREYFUS's letter.

31.     That on several occasions, DREYFUS also made references that "Romanians, [since FORBES is part Romanian], are known to be beautiful, but thieves." At different times, DREYFUS mentioned to FORBES that "I did not have a woman for a long time, and I wish I had a wife and children because I am very lonely." His attitude also changed after he gave FORBES a ride home after a Board meeting, and saw the house FORBES lived in. He talked a lot about FORBES's privileged way of life and also about her car, which to him appeared to be beyond his means. Such comments made FORBES feel very uncomfortable to be alone with him in his office, or after hours. Some of these comments and his behavior were overheard and observed by FORBES's colleagues, because DREYFUS spoke loudly, repeatedly, and gossiped about every single employee and resident of the TOWNSHIP. DREYFUS also stated that he felt that a lot of privileged people were against him, that he would fight them publicly with everything in his power, and that he will never back down from such a fight. FORBES felt that this comment was also directed at her.

32.     Consequently, some of the Township employees came to FORBES to offer their assistance in case FORBES had to stay after hours, or on any occasion alone with DREYFUS. The fact that BIGSBY stayed behind made DREYFUS, who kept on urging her to leave, visibly quite annoyed. At 6 PM, FORBES was supposed to get a ride back home with her mother, but DREYFUS kept on editing that letter. FORBES's colleague, Rebekah Kelly ("KELLY"), let FORBES's mother to wait for FORBES inside the TOWNSHIP's office. DREYFUS didn't see FORBES's mother stepping in, but he yelled at KELLY to go home. After KELLY got out of the

office, DREYFUS made another attempt to send BIGSBY home. DREYFUS refused, but then he saw FORBES's mother, and he decided to rush finishing the letter, and let FORBES go home.

33.     That on 03/11/2020, DREYFUS called a staff meeting with permanent and temporary employees, all women. He berated the staff's performance and attitude during elections, and wanted to make very clear that any adverse reactions of the public concerning the election process were only the fault of the staff and no fault of his own. He threatened that if any of the women employees who "did not know how the real world worked," or "have not worked in an office long enough," dared to tell anyone anything bad about him, or file a grievance against him, he would make everybody's "life miserable." He also yelled that, "I am the boss and I am allowed to do anything I want, including yell at employees." He also expressed his outrage that no staff showed any appreciation towards his person. When staff mentioned that DREYFUS had created a hostile work environment, and felt sick and in pain, DREYFUS stated "You can quit." He was very hostile, and his words and attitude made FORBES feel intimidated and emotionally distressed.

34.     That on 03/12/2020, there was an urgent meeting with election and permanent staff in Assessing Room at 1:00 PM, without the Clerk's knowledge, conducted by Angela Ryan ("RYAN"), the President of the Technical, Professional and Office Workers Association of Michigan ("TPOAM"), and Kristi Schaeding ("SCHAEDING"), the Vice President of TPOAM **to discuss DREYFUS's volatile behavior toward permanent and temporary employees in his department, and even toward some of the Meridian residents, especially women. The complaint of the employees concerned the creation of a hostile work environment due mainly to DREYFUS's explosive personality and daily alcohol consumption and marihuana smoking.** The meeting was called by Rebekah Kelly, who also read a letter written by the staff

9

member who quit because of the injurious hostility promoted by DREYFUS during the 03/11/2020 meeting regarding the elections. After listening to the complaint, SCHAEDING **acknowledged that DREYFUS broke a multitude of Township policies, which she actually located in the Township manual**. Participants were invited to record the meeting, and FORBES has a recording of the meeting that she is in the process of having it transcribed by a certified transcription service.

35.     That following the above-mentioned meeting, FORBES also submitted to SCHAEDING a written summary of the main events which took place from the beginning of FORBES's employment at the TOWNSHIP and up to the 03/12/2020 staff meeting. These events were created by DREYFUS and MARX with the intent to harass, abuse, and discredit FORBES, ultimately leading to FORBES's wrongful termination on 03/23/2020. FORBES was the only employee from the staff meeting who was terminated.

36.     That in her letter dated 03/23/2020, MARX stated that FORBES's employment with the TOWNSHIP was terminated because "performance expectations for satisfactorily completing essential duties have not been met during the probationary period." However, her termination reason was not supported by FORBES's **Performance Evaluation** dated 02/26/2020, nor by the events that occurred during FORBES's employment at the TOWNSHIP. According to this evaluation, FORBES's **Job Knowledge** was given a **"V"** (Very Good) rating, FORBES's **Quality of Work** was given an **"N"** (Needs Improvement) rating, FORBES's **Productivity** was given an **"S"** (Satisfactory) rating, FORBES's **Oral Communication** was given an **"S"** (Satisfactory) rating, FORBES's **Written Communication** was given an **"N/A"** (Not Applicable) rating, FORBES's **Initiative** was given an **"O"** (Outstanding) rating, FORBES's **Attitude and Cooperation** was given a **"V"** (Very Good) rating, FORBES's **Work**

with Others/Teamwork was given a **"V"** (Very Good) rating, FORBES's **Dependability** was given an **"O"** (Outstanding) rating, and FORBES's **Capacity to Develop or Improve** was given a **"V"** (Very Good) rating.

37. That a<u>ll in all, there were 2-Outstanding's, 4-Very Good's, 2-Satisfactory's, 1-Needs Improvement, and 1-Not Applicable.</u> Nowhere on FORBES's evaluation was any rating of "U" (Unsatisfactory) as claimed by MARX so as such, her invoked reason for discharging FORBES from her employment was false.

38. That concerning the "S" (Satisfactory) ratings, FORBES strongly disagrees with DREYFUS's evaluation because FORBES's performance was much better than DREYFUS assessed, especially since his reasoning for giving me the "S" ratings was that "no one should have the audacity to give oneself so many ratings of Outstanding..."

39. That as far as the "N" (Needs Improvement) rating, which referred to the writing of the minutes, FORBES also believed that her performance deserved a higher consideration, mainly because the reason for the rating was that we differed on the meaning of what the word "minutes" represented. To FORBES's knowledge, and according to the Robert's Rules of Order, the minutes had to be concise, accurate, and balanced. In other words, the minutes had to be short, accurate, and neutral. However, DREYFUS wanted the minutes to present his own interpretation of the Board meetings, as explicitly as possible, no matter how lengthy they would become.

40. That the quality of FORBES's employment was not the true reason for FORBES's termination of employment at the TOWNSHIP... In reality, the reason for FORBES "separation from employment" was harassment and abuse suffered from DREYFUS and MARX in its ugliest

form. As such, it took a very long time for FORBES to come to grips with the nightmare that just happened to her, but considering the gravity of the situation both DREYFUS AND MARX displayed with impunity, FORBES decided to submit a complaint to MDCR in order to try to obtain justice from her rights having been violated by the TOWNSHIP. FORBES's complaint was also reviewed by the United States Equal Employment Opportunity Commission ("EEOC") who provided FORBES with a Notice of Right to Sue.

## PROCEDURAL REQUIREMENTS

41.     That Plaintiff repeats and incorporates each and every allegation set forth in paragraphs 1 through 40 of the Complaint as if more fully set forth herein.

42.     That FORBES filed a timely charge of employment discrimination against the above-named Defendant with the Michigan Department Of Civil Rights ("MDCR") and with the Equal Opportunity Employment Commission ("EEOC").

43.     That FORBES brings this action within ninety (90) days of the receipt of a Notice of Right to Sue, issued by the EEOC on 04/23/2024, a copy of which is attached hereto as **Exhibit 1**, including a copy of the envelope with the day of receipt written on it.

## COUNT I

### Pleading a Cause of Action for Sex Discrimination in Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and the Michigan Elliot Larson Civil Rights Act of 1976

### Sexual Harassment: Hostile Work Environment

44.     That Plaintiff repeats and incorporates each and every allegation set forth in paragraphs 1 through 43 of the Complaint as if more fully set forth herein.

45.     That as more fully set forth above, from the very beginning of FORBES's employment, under the guise of instructing FORBES in different aspects of her job, and while

12

talking incessantly, DREYFUS began an insidious dropping of unwanted sexually loaded suggestions, such as "I did not have a woman for a long time, and I wish I had a wife and children because I am very lonely," or referring to one time after FORBES's mother and I gave him a ride to his home when his car was in the shop for repairs, "when I was younger, I had girlfriends that took me around and did all sorts of things for me all the time because that what girlfriends do," and many more of the same.

46.     That DREYFUS would usually get very close to FORBES on a daily basis, while talking nonstop, invading FORBES's personal space so close that FORBES could smell his breath laden with marihuana smoke and booze.

47.     That after a board meeting, DREYFUS gave FORBES a ride home, and took FORBES to lunch once in his car, as he used to do with all the employees in his department. After seeing where FORBES lived and FORBES's parents' car, DREYFUS concluded that FORBES was a privileged person, and as such, FORBES needed to have him give HER lessons on how to be more humble in life. Those two rides made FORBES sick to her stomach because his car, just like his person, smelled very badly of marihuana and booze, and he swerved and sped over the speeding limit without any regard to anyone's safety.

48.     That DREYFUS also made FORBES aware, many times, that a lot of privileged people were against him, and that he would fight them publicly, with everything in his power, and that he will never back down from such a fight. FORBES felt, considering how unpredictable DREYFUS could be, that somehow that comment was also directed at FORBES.

49.     That on several occasions, DREYFUS also made innuendos such as, "Romanian women [since I am part Romanian] are known to be beautiful, but they are also known to be thieves." FORBES believes that he mixed up the Romanians with the Roma people, better

13

known as gypsies, who were sometimes accused of such acts, but as to anything that did not refer to FORBES's daily work, FORBES had never cared to respond in any way.

50.     That FORBES had never responded to any of DREYFUS's inappropriate insinuations, nor to his offensive very long stares either, which made FORBES feel insulted, demeaned, and extremely uncomfortable. FORBES had usually listened in silence to his outlandish ramblings for a short time, after which FORBES reminded him that she had to return back to work, because if FORBES left too fast, or shift her attention away from these meetings too quickly, DREYFUS would get very annoyed and aggressive, and FORBES feared that FORBES would get physically attacked.

51.     That DREYFUS also started ordering FORBES to stay after hours, alone, for a multitude of trivial reasons. Up to a point, FORBES managed to avoid staying over hours giving as reason that FORBES's mother was coming to pick FORBES up at the closing time, and that FORBES was needed right after work to take care of her disabled father. By this time, some of DREYFUS's very loud, pejorative comments and his hostile behavior toward FORBES were overheard and observed by her colleagues, who started coming up to FORBES to offer their assistance in case FORBES had to stay after hours, or on any occasion alone with DREYFUS.

52.     (a)     That the TOWNSHIP failed to promptly and appropriately investigate, address and correct the hostile work environment; and

(b)     That the hurt inflicted on FORBES caused by DREYFUS and MARX and allowed by the TOWNSHIP contributed to and created a hostile work environment.

(c)     That as a proximate result of the foregoing, Plaintiff, a law school graduate who was not able to even study for the bar, let alone sign up for it and obtain her bar license, due to the violations perpetrated against her by Defendant and having had her life put on hold,

14

suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits. Since Defendant prevented Plaintiff from receiving unemployment benefits until a year later which affected her base pay, Plaintiff not only suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, depression, phobias, severe distress, headaches, stress for which she has been taking medication, and loss of self-esteem. Also due to Defendant's outrageous and malicious conduct and violation of Plaintiff's rights causing her financial loss of past and future earnings, Plaintiff along with her family faced eviction, and was forced to incur other incidental and consequential damages and expenses.

(d)     That the conduct of Defendant was repetitive, outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages.

(e)     That by reason of the foregoing outrageous and malicious violations of Plaintiff's civil rights by Defendant, Plaintiff has been damaged in the sum of Ten Million Dollars ($10,000,000.00) and is further entitled to punitive damages in the amount of Five Million Dollars ($5,000,000.00).

## COUNT II

**Pleading a Cause of Action for Sex Discrimination in Violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and the Michigan Elliot Larson Civil Rights Act of 1976**

**Quid Pro Quo Sexual Harassment**

53.     That Plaintiff repeats and incorporates each and every allegation set forth in paragraphs 1 through 52 of the Complaint as if more fully set forth herein.

15

54.     That DREYFUS wanted to hurt FORBES very badly for rejecting his unwanted lovesick advances, so in view of the Covid-19 possibility of Township employees being ordered to start working from home, DREYFUS apparently wanted FORBES terminated the moment the shutdown order came through. Consequently, he demanded that FORBES finish all the work that was FORBES's responsibility during the week prior to 03/23/2020. Although in hindsight, in view of FORBES's "unsatisfactory work performance," according to MARX's false claim, DREYFUS's demand for finishing all work within FORBES's range of responsibility did not make much sense... If FORBES did such a poor work, then why ask FORBES to finish it? FORBES's completed workload thus enabled both DREYFUS AND MARX to fire FORBES worry-free right on that very Monday!

55.     That the would-be termination event occurred right after the WALSH announced that the TOWNSHIP would be shutdown indefinitely, and after almost all the other employees left the building. That because first, firing FORBES on March 23 left FORBES unemployed indefinitely during the COVID-19 Pandemic, and second, because DREYFUS knew that FORBES's father, who was critically ill and almost completely disabled, was recently admitted into a rehabilitation facility with a fractured shoulder, and therefore, FORBES's need for employment was imperative in order to be able to help her family survive those very difficult times.

56.     (a)     That Defendant failed to promptly and appropriately investigate, address and correct DREYFUS's violation of her rights free from sexual harassment and that DREYFUS did make repeated unwanted and unwelcomed sexual advances toward FORBES, as more fully set forth in this Complaint.

16

(b)     That said unwelcome sexual advances and harassment adversely affected Plaintiff's compensation, and the terms, conditions and privileges of her employment.

(c)     That the TOWNSHIP knew or should have known about DREYFUS's conduct, and intentionally, negligently or recklessly failed to halt DREYFUS's inappropriate conduct toward FORBES.

(d)     That as a proximate result of Defendants sex discrimination against Plaintiff, Plaintiff has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits; Plaintiff has suffered and continues to suffer anguish, depression, phobias, headaches, stress, and loss of self-esteem, for which she has been taking medication, and has been forced to incur other incidental and consequential damages and expenses.

(e)     That Defendant failed to promptly address and correct the quid pro quo harassment of Plaintiff, is vicariously liable and allowed and contributed to and/or created the quid pro quo harassment of Plaintiff.

(f)     That by reason of the foregoing outrageous and malicious violations of Plaintiff's civil rights by Defendant, Plaintiff has been damaged in the sum of Ten Million Dollars ($10,000,000.00) and is further entitled to punitive damages in the amount of Five Million Dollars ($5,000,000.00).

## COUNT III

**Pleading a Cause of Action for Retaliation in Violation of 42 U.S.C. § 2000e and the Michigan Elliot Larson Civil Rights Act of 1976**

**Retaliation**

57.     That Plaintiff repeats and incorporates each and every allegation set forth in paragraphs 1 through 56 of the Complaint as if more fully set forth herein.

58.     That on 03/23/2020, at about 3:00 PM, right after WALSH announced the shutdown of the Township operations, DREYFUS demanded FORBES followed him into MARX's office for another ad-hoc "post evaluation" meeting, as he put it.

59.     That **this meeting and her following termination was in reality in <u>retaliation</u> to her complaint against DREYFUS and MARX to the TPOAM leadership.**

60.     That DREYFUS, after being absent from work most of the day, as usual, gave FORBES no prior notice of such a meeting. DREYFUS appeared again high on drugs and alcohol, and his entire demeanor expressed a lot of hostility, so FORBES got very scared. **MARX** was standing in front of the business office talking to **Township Trustee Kathy Ann Sundland (SUNDLAND)**, and **Police Chief Plaga (PLAGA)**, so FORBES asked for time to go to the bathroom.

61.     That while there, FORBES called RYAN, but she didn't answer. Neither did SCHAEDING, nor Stephen Gebes, IT Director of the TOWNSHIP, so FORBES then called her mother, who was already outside in the parking lot, and asked her to come inside the building. Since FORBES was afraid of a new confrontation, or worse, the possibility of being physically attacked, FORBES first asked to have the meeting rescheduled to be assisted by a representative.

62.     That both DREYFUS and MARX categorically refused, so FORBES became terrified that she would not be allowed by DREYFUS to leave the lobby on her own. FORBES then decided to record the event and is in the process of having it transcribed by a certified transcription service.

63.     That as soon as FORBES's mother entered the building, everything precipitated FORBES walked toward the exit door of the lobby, but DREYFUS crossed the lobby faster, trying to block FORBES from leaving out of the building. He raised his voice menacingly and

got closer to FORBES and her mother, demanding nonstop that it was an employment matter, and that FORBES had to follow him to MARX's office. He was getting visibly angrier, he talked nonstop, and his voice was getting louder and louder. He then demanded that FORBES's mother leave the building immediately, or he would ask the Police Chief to take action against her.

64.     That at that point, FORBES's mother asked PLAGA whether he was willing to accompany FORBES into the meeting. PLAGA replied in the negative, stating that the meeting was an HR matter. To that, FORBES's mother urged FORBES to leave the building with her. DREYFUS screamed again demanding that only FORBES's mother leave the building. FORBES's mother complied by retreating to the door, but waiting for FORBES to reach her, so they could both exit the building. DREYFUS hen quickly got closer to FORBES, blocking her way to the exit door. He had his fists clenched, was spitting saliva out of his mouth almost over FORBES's mother's person, and appeared to be posturing an attack, trying to scare her out the exit door alone.

65.     That while trying to get to the exit door, FORBES saw **WALSH** peeking pusillanimously from his office, watching the show, but saying nothing to stop DREYFUS's actions against FORBES and her mother.

66.     That **Deputy Township Manager Perry (PERRY)** also appeared and crossed the lobby sheepishly, very quickly, but stopped behind the counter to watch the events develop as well, while PLAGA was just standing in place, also watching, but saying nothing. MARX tried to entice her to still come to the meeting alone. She said that there were things to discuss, because if FORBES left, then MARX had to send FORBES an email, and FORBES wouldn't like that. FORBES replied, "send me an email," while finally managing to squeeze herself by DREYFUS, who was still blocking FORBES's exit. FORBES got frantic with fear as DREYFUS

got almost not more than two steps away from FORBES and her mother, concentrating only on reaching the exit door as fast as humanly possible. When FORBES finally got there, FORBES felt a big pinch of her arm, but did not stop. FORBES grabbed her mother's arm, and together they managed to get through the exit door. FORBES then heard DREYFUS yell out behind her back "goodbye, Daria" sarcastically, but she was already out the door and out of his reach! FORBES was never so frightened in her entire life!

67.    That when FORBES finally got home, she noticed a red and painful mark on her arm. The same evening, FORBES received an email from MARX notifying her of the "separation of employment." The next day, by another email, MARX demanded FORBES return her key to the TOWNSHIP building immediately. In view of what had happened to FORBES only the day before, FORBES could not get herself to come back there to drop off the key. FORBES offered to mail the key the next day, but MARX opted instead to have a police officer come to FORBES's home and get the key.

68.    That overnight, FORBES's red, painful mark on her arm turned blue, so apparently, DREYFUS **had his satisfaction on physically and emotionally hurting FORBES after all, first by trying to forcefully detain FORBES in the Township building, and second, by assaulting and battering FORBES, all against her will**. He thus left FORBES, as well as her family, with the most traumatic (and painful) employment experience of her life!

69.    (a)    That therefore, Plaintiff was the subject of retaliatory conduct in violation of the above said laws on the part of Defendant.

(b)    That the TOWNSHIP knew or should have known about DREYFUS's and MARX's conduct, and intentionally, negligently or recklessly failed to halt DREYFUS's and MARX's inappropriate conduct toward Plaintiff.

(c)     That as a proximate result of Plaintiff's complaint to TPOAM, and other TOWNSHIP staff including her direct supervisor BIGSBY, she suffered discriminatory loss and elimination of pay, overtime and bonus and a loss of advancement opportunities and benefits, will continue to suffer damages in the future. Plaintiff has suffered and continues to suffer emotional upset, anguish, stress, loss of enjoyment of life and other incidental and consequential damages and expenses.

(d)     That the conduct of Defendant was outrageous, was done in a deliberate, callous, malicious, fraudulent and oppressive manner intended to injure Plaintiff; was done with an improper and civil motive, amounting to malice and spite; and was done in conscious disregard of Plaintiff's rights. Defendant tried to cover up their clear retaliatory actions by making patently false and misleading statements to the Michigan Department of Civil Rights. Plaintiff is therefore also entitled to an award of punitive damages.

(e)     Plaintiff has been damaged in the sum of Ten Million Dollars ($10,000,000.00) and is further entitled to punitive damages in the amount of Five Million Dollars ($5,000,000.00).

## COUNT IV

### Pleading a Cause of Action for Negligent Infliction of Emotional Harm

70.     That Plaintiff repeats and incorporates each and every allegation set forth in paragraphs 1 through 69 of the Complaint as if more fully set forth herein.

71.     That DREYFUS constantly gossiped about everyone, especially about MARX, calling her "a Google wannabe lawyer," but when he wanted to abuse someone, the both of them appeared to conspire perfectly. During the 02/27/2020 ad-hoc meeting, **which started at 11:00 AM, appeared to be in retaliation for FORBES's disagreement with MARX's**

recommendation to extend **FORBES's probation to 03/20/2020, and to FORBES's suggestion to DREYFUS to have the 15 minute meetings with him to discuss FORBES's minute writing upon completion.** The main subject of the meeting consisted of DREYFUS's unhappiness with supposedly FORBES's minute writing, but FORBES sensed that his anger, which very fast turned into a violent rage had to do with a completely different matter than the minutes.

72.     That both DREYFUS and MARX took turns unleashing an unbelievable offensive against me by screaming and using pejorative language.

73.     That right about then, **the HR Director threatened with extension of FORBES's probation to the new date of April 10, 2020,** if she so decided. That remark made me believe that **the manipulation of the hiring date by the HR Department, perhaps in accordance with the Township Management Department** (if this action, as the HR Director stated, had been in practice for many years at the Township)**, had also something to do with the free manipulation of firing employees at will, since they had no protections during the probationary period.** However, the HR Director's new threat was not followed by any official paperwork that I am aware of. And so on, and so on, the meeting continued with the two of them throwing nonstop insults and threats for two hours and fifteen minutes, until 1:15 PM.

74.     That during their violent outbursts, FORBES got terrified that any of them, but more DREYFUS could physically hurt her because on quite a few occasions, he invaded FORBES's personal space with his fists clenched. When FORBES left the room FORBES was in tears, felt completely drained, violated, very vulnerable, and emotionally distressed.

75.     That FORBES came with great expectations to learn about the local government function and elections, but after that terrible meeting, FORBES felt that her confidence in a

fulfilling career at the Meridian Township was severely shaken. FORBES also felt that what was happening to her was way too big for just one person to bare, so FORBES made an appointment with SCHAEDING and RYAN to talk to them about FORBES's situation, at the end of that very day. They both listened, and after confirming with Al Brzys, the union's legal representative, advised to **never accept to enter into a meeting with DREYFUS and MARX alone, without another person present.**

76.     That Defendant did carelessly, negligently and/or recklessly cause and/or allow Plaintiff to suffer severe emotional distress through DREYFUS' repeated acts of sexual harassment and through MARX's actions of ethnic discrimination and retaliation.

77.     That Plaintiff is taking medication for the emotional injuries inflicted upon her by Defendant.

78.     That as a result of the foregoing egregious conduct, Plaintiff suffered severe emotional distress, and has incurred damages thereby.

79.     That the conduct of Defendant was willful, wanton and was done in conscious disregard of Plaintiff's rights. Plaintiff is therefore also entitled to an award of punitive damages.

### COUNT V

#### Pleading a Cause of Action for Reasonable Costs and Attorney Fees

80.     That Plaintiff repeats and incorporates each and every allegation set forth in paragraphs 1 through 79 of the Complaint as if more fully set forth herein.

81.     That as a result of the foregoing, Plaintiff is still seeking an attorney who would be entitled to the reasonable costs and attorney fees associated with this action.

82.     That Plaintiff reserves the right to Amend this Complaint.

23

**WHEREFORE**, Plaintiff requests this Honorable Court grant judgment to her containing the following relief:

1.    An award of Plaintiff's actual damages in an amount not less than Three Million Five Hundred Thousand ($3,500,000.00) dollars for loss of wages, overtime, bonuses, benefits, and promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salaries and benefits.

2.    An award of damages in an amount not less than Five Million Dollars ($5,000,000.00) to compensate Plaintiff for mental anguish, humiliation, embarrassment, and emotional distress.

3.    An award of punitive damages in the amount of Ten Million Dollars ($10,000,000.00).

4.    An award of reasonable future attorney's fees and the costs of this action; and

5.    Such other relief as this Court may deem just and proper.

Respectfully submitted,

Date: July 24, 2024

/s/ *Daria J. Forbes*
Daria J. Forbes
IN PROPRIA PERSONA
1429 Weatherhill Court
East Lansing, Michigan 48823
(517) 883-1413
djforbes@epiranhabiz.com

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

**DARIA FORBES**

     **Plaintiff,**　　　　　　　　　　　　**CASE NO.:**

**v.**

**MERIDIAN CHARTER TOWNSHIP**

     **Defendant**

| | |
|---|---|
| Daria Forbes<br>Plaintiff<br>IN PROPRIA PERSONA<br>1429 Weatherhill Court<br>East Lansing, MI 48823<br>(517) 883-1413<br>djforbes@epiranhabiz.com | Meridian Charter Township<br>Defendant<br>5151 Marsh Road<br>Okemos, MI 48864 |

### PROOF OF SERVICE

Plaintiff Daria J. Forbes served Defendant Meridian Charter Township a copy of this

Complaint and Proof of Service at the address for Meridian Charter Township listed above, and

served a copy to the United States Equal Employment Opportunity Commission at the address

listed on the Notice of Right To Sue by 1st class UNITED STATES MAIL on July 24, 2024.


                                         */s/ Daria J. Forbes*

Date:  July 24, 2024　　　　　　　　　Daria J. Forbes
　　　　　　　　　　　　　　　　　　IN PROPRIA PERSONA
　　　　　　　　　　　　　　　　　　1429 Weatherhill Court
　　　　　　　　　　　　　　　　　　East Lansing, Michigan 48823
　　　　　　　　　　　　　　　　　　(517) 883-1413
　　　　　　　　　　　　　　　　　　djforbes@epiranhabiz.com